IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| ARROW CHILD & FAMILY MINISTRIES, <br><br> Plaintiff, <br><br> v. <br><br> RITE OF PASSAGE, INC., <br><br> Defendant. | 2:23-CV-017-Z-BR |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's Motion for Summary Judgment ("Motion") (ECF No. 27), filed February 2, 2024. Plaintiff filed its Response ("Response") (ECF No. 34), on February 23, 2024, and then filed an Amended Response ("Amended Response") (ECF No. 44), on March 11, 2024. Having reviewed the briefing and law, the Court **GRANTS** the Motion **IN PART**.

### BACKGROUND

This is a contracts case. Plaintiff Arrow Child & Family Ministries ("Arrow"), as landlord, and Defendant Rite of Passage, Inc., ("ROP"), as tenant, entered a lease (the "Lease") for Defendant to operate a residential treatment center ("RTC") for foster children on the premises. ECF No. 28 at 4. The children would be referred to Defendant by single source continuum contractors ("SSCCs") — entities that contract with the Texas Department of Family and Protective Services to provide services to foster children.[1] ECF No. 44 at 7. As such, there existed (1) a Lease between Plaintiff and Defendant, and (2) several "Provider Service Agreements" between Defendant and the SSCCs.

---

[1] Per the pleadings, Defendant contracted with four SSCCs: (1) All Church Home Child and Family Services ("ACH"); (2) Saint Francis Community Services in Texas, Inc. ("St. Francis"); (3) St. Judge's Ranch of Texas on behalf of its Belong division ("Belong"); and (4) Texas Family Initiative LLC ("TFI"). ECF No. 28 at 12.

Plaintiff alleges that Defendant (1) breached its SSCC Provider Service Agreements; (2) breached its Lease with Plaintiff; and (3) is using the former to justify the latter. ECF No. 44 at 15. Plaintiff further argues that its Lease prohibits early termination unless *all* the SSCC Provider Service Agreements are terminated, and — in its view — Defendant still had some in place when it purported to terminate the Lease. *Id.* at 17. Lastly, Plaintiff avers that Texas law (here, the Prevention Doctrine) prevents Defendant from "taking advantage of its own breach." *Id.* at 15. Defendant responds that Plaintiff is attempting to change this case from a Lease dispute into "a 'case within a case' involving alleged breaches of contracts by and between Defendant and non-party SSCCs." ECF No. 48 at 1. In Defendant's view, (1) the Prevention Doctrine does not apply to commercial disputes involving sophisticated parties; (2) Plaintiff cannot establish the Prevention Doctrine even if it applied; and (3) the SSCCs terminated the entire integrated Provider Agreements, not just part of them. *Id.* at 2–8.

**LEGAL STANDARDS**

Summary judgment is appropriate if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The movant meets its initial burden by showing that the "evidence in the record would not permit the nonmovant to carry its burden of proof at trial." *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998). Facts are considered "material" only if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In determining whether a genuine issue as to any material fact exists, [this Court] must view the evidence in the light most favorable to the nonmoving party." *Fahim v. Marriott Hotel Servs., Inc.*, 551 F.3d 344, 348–49 (5th Cir. 2008); *Roton v. Peveto Fin. Grp., LLC*, 649 F. Supp. 3d 300, 313 (N.D. Tex. 2022).

ANALYSIS

I.  **A genuine issue of material fact exists as to whether Defendant breached Section 4 of its Lease.**

Plaintiff argues that Defendant (1) breached its Provider Agreements with the SSCCs and (2) breached Section 4 of its Lease. ECF No. 44 at 5, 15–16. Section 4 states that the premises "are to be used and occupied by Tenant solely as [a] residential treatment center for housing and rehabilitation of children in state conservatorship and the programs and services related thereto, and for no other purpose or use without the prior written consent of Landlord." *Id.* at 5. RTCs, per the Texas Administrative Code, "are general residential operations that provide treatment services to children with emotional disorders."[2] 26 TEX. ADMIN. CODE § 748.5; *id.* at 6. Such children — deemed "high acuity"[3] — often demonstrate behaviors that "aren't conducive to being in the home environment" and therefore need the "more intense therapeutic environment" provided by an RTC. ECF No. 44 at 6.

But according to Plaintiff, Defendant "did not operate [the facility] as a[n] RTC." *Id.* at 10. On the contrary, Defendant "was only equipped to receive children classified as basic and moderate — children . . . placed in or transferred among *ordinary* foster homes on a daily basis." *Id.* (emphasis added). It was "unable to admit children the SSCCs were appropriately referring" despite promising that it "would have appropriate staff and accept more than half of all referrals[.]" *Id.* at 8. It had "inexperienced staff, staffing issues, problems leading to law enforcement involvement with the youth under [the RTC's] care, and unsuccessful discharges."

---

[2] Upon entering state custody, children receive one of four "service level" designations: "Basic, Moderate, Specialized, or Intense — based on their physical and psychological needs." *M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 244 (5th Cir. 2018). "Placements must be licensed to care for children at specific service levels." *Id.* RTCs "provide therapeutic treatment for children with more severe emotional or mental-health issues." *Id.*

[3] "In the foster system, a child with 'higher acuity' generally refers to a child that is Specialized, Intense, or has other significant emotional or behavioral issues." ECF No. 44 at 9.

*Id.* at 10. And it "only had capacity to take children who did not have high acuity needs — meaning [Defendant] could not take RTC placements." *Id.* at 11.

Defendant responds that its performance under the Provider Agreements is not at issue because (1) all four SSCCs terminated the Provider Agreements "without cause under Section 7.2, *not* for an alleged breach under Section 7.3," and, in any event, (2) Plaintiff is not "a party to those contracts, a third-party beneficiary to those contracts, []or an assignee of the SSCCs' . . . rights." ECF No. 48 at 1, 6 (emphasis in original). Both arguments fail.

First, Defendant's claim that the SSCCs "terminated [the Provider Agreements] without cause" is a stretch. *Id.* at 6. True, each SSCC terminated its Provider Agreement pursuant to Section 7.2 ("Termination with Notice"), not Section 7.3 ("Termination upon Breach"). *See* ECF No. 40-1 at 137 (TFI's Letter); *id.* at 138 (ACH's Letter); *id.* at 139 (Saint Francis's Letter); *id.* at 140 (Belong's Letter). But in doing so, they provided meaningful context. For example, Saint Francis confirmed that "[t]ermination *is due to failure to follow the terms of the contract.*" *Id.* at 139 (emphasis added). And in TFI's termination letter, it cited "multiple issues surrounding [Defendant's facility]." *Id.* at 140.

Second, it is true that Plaintiff is not a "party" to the Provider Agreements. Indeed, all four Provider Agreements say as much:

> **No Third-Party Rights.** Except for DFPS, which shall be deemed to be a third-party beneficiary to this Agreement, this Agreement is intended solely for the benefit of the parties hereto and shall not be deemed to create any rights in any other person or entity.

*See* ECF No. 40-1 at 51 (Defendant's Provider Agreement with Belong); *id.* at 80 (Defendant's Provider Agreement with Saint Francis); *id.* at 107 (Defendant's Provider Agreement with TFI); *id.* at 132 (Defendant's Provider Agreement with ACH). But Plaintiff *is* a party to its Lease with Defendant — and as discussed *supra*, that Lease required Defendant to operate as an RTC.

ECF No. 44 at 5. Accordingly, alleged breaches by Defendant of its Provider Agreements may be relevant evidence as to *whether it breached Section 4 of the Lease*.

As to that central question, Defendant argues that its performance is not at issue. *See* ECF No. 48 at 1 ("[Plaintiff's] attempt to inject a dispute that does not exist (*i.e.*, the SSCCs vs. [Defendant]) is a red herring[.]"). Nevertheless, Defendant argues that Plaintiff "provides no evidence [Defendant] did not accept *the majority* of referrals, which could be a breach, as opposed to *all* referrals, which is not." *Id.* at 7 (emphasis in original). True, the Provider Agreements require that Defendant accept the majority — not all — of the SSCC-referred youth:

> In support of this Compensation Amendment, BELONG expects that Rite of Passage will accept the majority of SSCC-referred youth.

ECF No. 40-1 at 58 (Defendant's Provider Agreement with Belong).

> In support of this Agreement, SSCC/SAINT FRANCIS expects that Provider will accept the majority of SSCC-referred youth.

*Id.* at 69 (Defendant's Provider Agreement with Saint Francis).

> In support of this Compensation Amendment, TFI expects that Rite of Passage will accept the majority of SSCC-referred youth.

*Id.* at 108 (Defendant's Provider Agreement with TFI).

> In support of this Agreement, SSCC/ACH expects that Provider will accept the majority of SSCC-referred youth.

*Id.* at 122 (Defendant's Provider Agreement with ACH).

But Defendant's response addresses only one of Plaintiff's arguments and the small minority of its evidence. For example, Plaintiff argues and evidences that (1) Defendant advertised as an RTC but "was only equipped to receive children classified as basic and moderate;" (2) the SSCCs complained that "we still have 0 kids placed with them" and "[Defendant] turn[s] down *every* referral sent" to it; (3) even as late as April 18, 2022, Defendant "was still trying to

get the required staff to accept children;" (4) between March 18, 2022, and April 8, 2022, Defendant was unable to take *any* children; and (5) Defendant had "inexperienced staff, staffing issues, problems leading to law enforcement involvement with the youth under [the RTC's] care, and unsuccessful discharges." ECF No. 44 at 11–13. Plaintiff provides ACH's statement that:

> We provided significant funding for the start up of this program yet *were never able to place children as agreed upon* due to your refusals to take children we referred and inability to maintain good standing with state licensing. Despite numerous attempts on our part, we were denied access to the guaranteed beds we were promised.

*Id.* (emphasis added).

Consequently, this Court cannot say that the "evidence in the record would not permit the nonmovant to carry its burden of proof at trial." *Smith*, 158 F.3d at 911. Whether Defendant breached Section 4 of its Lease is a question that cannot be resolved at summary judgment.

**II.     Defendant properly exercised the Lease's early termination right.**

The Court turns to the text of the Lease's early termination provision — Section 1(j). It provides, in sum:

> In the event either (i) Tenant's SSCC Provider Services Agreement ("Tenant's Provider Agreement"); (ii) the facility license for the Premises issued by Texas Health and Human Services ("Tenant's License") is terminated; or (iii) funding for the services provided by Tenant under Tenant's Provider Agreement is unavailable, suspended or lost ("Loss of Funding") for any reason, Tenant shall have the right to terminate this Lease ("Tenant's Early Termination Right") by providing Landlord sixty (60) day prior written notice that Tenant it exercising Tenant's Early Termination Right due to any one or combination of (i) the termination of Tenant's Provider Agreement; (ii) the termination Tenant's License, or (iii) Loss of Funding whereupon this Lease will terminate on the 60th day after Landlord's receipt of Tenant's written notice it is exercising its Early Termination Right pursuant to this provision.

ECF Nos. 28-1 at 8; 44 at 14.

In Plaintiff's view, Section 1(j)(i) requires that *all* of Defendant's SSCC Provider Agreements be terminated before the early termination right be exercised. ECF No. 44 at 18.

6

Plaintiff reasons that the phrase "Tenant's Provider Agreement" — as used in Section 1(j)(i) — "indicates a singular class of service agreements between the SSCCs and ROP." *Id.* Defendant responds that the Lease "plainly states that if *a* Provider Agreement is terminated, then ROP's early termination right is triggered." ECF No. 40 at 20 (emphasis added). In other words, the termination of just one SSCC Agreement suffices.

The evidence indicates, however, that all of Defendant's SSCC Agreements *were* terminated, rendering the question moot. ECF No. 48 at 6. Indeed, all four of the SSCCs terminated their Provider Agreements pursuant to Section 7.2.[4] *See* ECF No. 38-1 at 136 (TFI's Letter) ("[T]his letter is a written 60-day notice of the intent . . . to terminate the Provider Agreement per Section 7.2[.]"); *id.* at 137 (ACH's Letter) ("Pursuant to Section 7.2 . . . please accept this letter as our official 60 days written notification to terminate the compensation amendment[.]); *id.* at 138 (Saint Francis's Letter) ("This is the official notice that Saint Francis . . . is terminating the Right of Passage Compensation Agreement[.]"); *id.* at 139 (Belong's Letter) ("This letter is to provide notice of termination of the . . . Provider Service Agreement Compensation Amendment.").

Plaintiff responds that the SSCCs merely "terminated the [Compensation Addendums]"[5] to the Provider Agreements — but not the Provider Agreements themselves. ECF No. 44 at 25. "Each notice specifically referred to the [Compensation Addendum] alone." ECF No. 44 at 13. In other words, "each one of the [Compensation Addendums] could be terminated by itself." *Id.* at 22. But Plaintiff's objections fail.

---

[4] The Provider Agreements are "substantially similar." ECF No. 40 at 12. ROP had, per the pleadings, four Provider Agreements with four SSCCs. In each Provider Agreement, Section 7.2 was entitled "Termination with Notice." ECF No. 28-1 at 50, 78, 105, 131. And each provides, *inter alia*, that "[e]ither party may terminate this Agreement with or without cause for any reason upon 60 days written notice." *Id.*

[5] By way of background, at the inception of the Provider Agreements, ROP and the SSCCs "agreed to amend the compensation portion of the Provider Agreements[.]" ECF No. 40 at 12. The terms of that new compensation structure are memorialized in an addendum to the Provider Agreements referred to as the "Compensation Addendum." *Id.*

First, the argument that the SSCCs' letters referred *only* to the Compensation Addendum is demonstrably false. On the contrary, TFI's letter did not refer to the Compensation Addendum at *all* — let alone exclusively. *See* ECF No. 40-1 at 137 (TFI's Letter). It provided, *inter alia*:

> [T]his letter is a written 60 day notice of the intent of Texas family Initiative LLC to terminate the Provider Agreement per Section 7.2 *of the Provider Agreement*. The termination date shall be 60 days following the postmarking of this letter.

ECF No. 40-1 at 137 (emphasis added). Moreover, while Belong's letter provided "notice of termination of the . . . Provider Service Agreement Compensation Amendment," it also stated that "[t]he last active date *of the Provider Service Agreement*" would be 60 days from the letter's date. *Id.* at 140 (emphasis added).

Second, Plaintiff offers no persuasive explanation, nor does it cite any authority, for its presumption that a party can unilaterally terminate a contract piecemeal — much less that the Compensation Addendum is "separately terminable" from the SSCC Provider Agreement. Its theory, in essence, is that terminating the Compensation Addendum simply reverted ROP and the terminating SSCC back to its original compensation plan under the Provider Agreements. *See* ECF No. 44 at 21–22 ("ROP's [Provider Agreements] with the SSCCs continued in effect even after the SSCCs sent termination notice for the [Compensation Addendums]).")

But Article 5.1 of the Compensation Addendum *replaced* Article 5.1 of the Provider Agreement, stating:

> The following agreement *replaces* the foster care fee-for-service rates shown in Appendix A as referred to in Article 5, and Term referred to in Article 7 of the Single Source Continuum Contract/or (SSCC) Provider Services Agreement. . . .
>
> This agreement is entered into between both parties to meet the needs of foster care youth . . . . All four SSCCs have entered a separate Memorandum of Understanding (MOU) to share capacity, and the provisions of the MOU are incorporated into this agreement in its entirety.

ECF No. 40-1 at 108 (emphasis added).

Because the Compensation Addendum replaced the Provider Agreement's prior compensation structure, "reverting back to it" is impossible. The Compensation Addendum's text, the Provider Agreement's structure, and the context of their interplay make clear that they — together — formed a fully integrated document. And indeed, Plaintiff's CEO recognized as much:

> Q:   But what I'm asking is, well, do you understand that even when there's a contract amendment that the amendment just becomes part — I mean, it just replaces part of the contract? Do you understand that?
>
> Mr. Earl: Form.
>
> A:   I do understand that.
>
> Q:   And then it becomes a fully amended document with the addendum included?
>
> Mr. Earl: Objection, form.
>
> A:   I do agree with that. I agree that the amendment becomes part of that contract.

ECF No. 40 at 21–22.

Moreover, nothing in the Provider Agreement provides, or even purports to provide, a mechanism for piecemeal termination. Nor could it — at least as to the Compensation Addendum — because the integrated Compensation Addendum provides the contract's payment structure. Without the integrated provisions government payment, there *is* no "Provider Agreement." Hence, when the SSCCs terminated the Compensation Addendum, they terminated the Provider Agreement with it.

Lastly, Plaintiff argues that Defendant is categorically preempted from invoking the Lease's early termination right because Defendant breached its SSCC agreements. *See* ECF No. 44 at 17 ("ROP's efforts to invoke Section 1(j), preceded by its breaches of several contracts, and

terminate the Lease early fun afoul of the rule that ROP cannot take advantage of its own failure to perform."). Again, the Lease's plain text provides:

> In the event either (i) Tenant's SSCC Provider Services Agreement ("Tenant's Provider Agreement"); (ii) the facility license for the Premises issued by Texas Health and Human Services ("Tenant's License") is terminated . . . Tenant shall have the right to terminate this Lease[.]

ECF Nos. 28-1 at 8; 44 at 14.

As Defendant notes, the Lease "did not impose a 'best efforts' obligation" as to "the triggering of the early termination provision or [Defendant's] exercise of its contractual rights." ECF No. 48 at 5. On the contrary, its plain meaning is that Defendant may terminate the Lease early if either Defendant or the SSCC terminates the Provider Agreement.[6] That text is unambiguous. *See Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004) ("If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous."); *Weaver v. Metro. Life Ins. Co.*, 287 F. Supp. 3d 645, 649 (N.D. Tex. 2017) (same); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) ("Whether a contract is ambiguous is a question of law for the court[.]"). And this Court will not impute into the contract terms the parties did not insert themselves — particularly when those terms were negotiated at length. *See* ECF No. 40 at 10 (Plaintiff's CEO acknowledging that the Lease's early termination provision was "specifically negotiated" and that "quite a few conversations" were had about it).

Because (1) Defendant's SSCC Provider Agreements were terminated and (2) the Lease imposes no additional constraints on the exercise of its early termination right, this Court finds that

---

[6] "The early termination provision was requested by ROP. It is a material term and ROP would not have entered into the Lease without it. This is because ROP's ability to pay rent under the Lease was based on the SSCCs paying ROP for services. If the SSCCs did not pay ROP for services, then ROP would be unable to pay rent, which is why inclusion of the early termination provision was required by ROP." ECF No. 40 at 10.

Defendant permissibly exercised its early termination right. *See Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129, 138 (5th Cir. 1979) (holding that even a "good faith obligation" cannot properly "be used to override or strike express contract terms"); *see also Bonanza Int'l, Inc. v. Rest. Mgmt. Consultants, Inc.*, 625 F. Supp. 1431, 1445–46 (E.D. La. 1986) ("[A]ny such implied covenant cannot properly be used to override or strike express contract terms."); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 485 (5th Cir. 1984).

### III.   The Prevention Doctrine does not bind ROP in these circumstances.

The Prevention Doctrine "is an equitable doctrine designed to preclude wrongful conduct that thwarts the occurrence of" a contractual condition. *In re iHeartMedia, Inc.*, 597 B.R. 339, 352 (Bankr. S.D. Tex. 2019). "When contractual obligations depend on the fulfillment of a condition, the doctrine of prevented performance deems that condition as fulfilled if a party wrongfully prevents that condition." *Id.* at 353; *Dorsett v. Cross*, 106 S.W.3d 213, 217 (Tex. App. 2003). In other words, "when a promisor wrongfully prevents a condition from occurring[,] that condition is excused." *Mendoza v. COMSAT Corp.*, 201 F.3d 626, 631 (5th Cir. 2000).

Here, Plaintiff avers that Defendant "seeks to take advantage of its own breach" of the Lease. ECF No. 44 at 15. "In short, [Defendant] promised [Plaintiff] it would solely operate [the facility] as a[n] RTC." *Id.* at 16. And by failing to do so, the argument goes, the Prevention Doctrine "prevents" Defendant from escaping liability.

The Court declines to apply the Prevention Doctrine for two reasons. First, as explained, the Prevention Doctrine is designed to preclude *wrongful* conduct. *In re iHeartMedia, Inc.*, 597 B.R. at 352. But here, (potentially) wrongful conduct by Defendant has yet to be fully adjudicated: whether Defendant breached Section 4 of its Lease with Plaintiff is a question that this Court leaves for trial. *See supra* Part I.

Second, this Court would not apply the Prevention Doctrine even if wrongful conduct had already been established. In *Devonshire Real Estate* — a precedential case from this District — Judge Boyle clarified that "courts have refused to extend the doctrine . . . where the dispute took place in a commercial setting and involved relatively sophisticated parties." *Devonshire Real Est. & Asset Mgmt., LP v. Am. Ins. Co.*, No. 3:12-CV-2199-B, 2014 WL 4796967, at *7 (N.D. Tex. Sept. 26, 2014). The *Devonshire* court declined to interrupt that tradition. *See id.* (refusing to apply "the doctrine" because the parties "are relatively sophisticated" and the dispute is "commercial").

That this case is commercial and the parties are sophisticated cannot be disputed. Plaintiff is a Texas corporation with 600 employees, an operating budget of $80 million, and years of experience in business. *See* ECF Nos. 48 at 4–5; 1-5 at 2–3. It operated a residential treatment center on the same property at issue here for years before leasing it to ROP. ECF No. 40 at 7. And Plaintiff's testimony — here, Arrow's chief executive officer ("Plaintiff's CEO") — establishes that Plaintiff thoroughly negotiated the (commercial) Lease's terms:

> Q: But the — the early termination provisions is something that was specifically negotiated between Arrow and Rite of Passage, right?
>
> A: Yes. There was something that Rite of Passage stitched out, and something that they wanted in the lease that we had quite a few conversations about.

ECF Nos. 28-1 at 163; 40 at 10.

Moreover, Plaintiff utilized a litany of resources to advise it during Lease negotiations. Plaintiff contracted with local and national real estate professionals to assist it in Lease negotiations. ECF No. 40 at 8. Plaintiff keeps legal counsel on retainer. *Id.* And Plaintiff's CEO testified that he believed the Lease was reviewed by legal counsel before it was signed. *Id.*

Second, this Court is aware of no precedent — and has been directed to no precedent — establishing that the Prevention Doctrine applies to commercial lease disputes where the tenant's

rental obligation is tied to a "pay-when-paid" provision like the one here. And the precedent that Plaintiff *does* cite is both non-binding and of limited relevance. *See, e.g.*, *Nalle v. Paggi*, 16 S.W. 932, 932 (1891) (applying the doctrine to a dispute regarding the creation of a party-wall); *SLT Dealer Grp., Ltd. v. AmeriCredit Fin. Servs., Inc.*, 336 S.W.3d 822, 831 (Tex. App. 2011) (applying the doctrine to the sales of auto notes); *Taco Boy, Inc. v. Redelco Co.*, 515 S.W.2d 319, 321 (Tex. Civ. App. 1974) (finding that a particular lease's termination provision, by its text, only conferred termination rights on the lessor, not the lessee).

Moreover, Plaintiff's assertion that "the doctrine applies to arms-length contacts [sic] in Texas" — predicated on an out-of-District case — does not overcome the foregoing analysis. ECF No. 44 at 17. That case held, *inter alia*, that a magistrate erred in holding "that the prevention doctrine was a duty not to be implied in arms-length contracts." *HDS Retail North Am., L.P. v. PMG Int'l, Ltd.*, 2012 U.S. Dist. LEXIS 139346, *4. But even assuming that the *HDS* court's holding applied to the instant case, the question is not whether the Prevention Doctrine applies to arms-length contracts — the question is whether the Prevention Doctrine applies to commercial disputes between sophisticated parties. According to caselaw from this District, it does not.

CONCLUSION

Defendant's Motion is **GRANTED IN PART** — as to whether Defendant properly exercised the early termination right (it did) and whether the Prevention Doctrine applies (it does not). However, whether Defendant breached Section 4 of the Lease with Plaintiff is a fact-intensive question unresolved by the pleadings. Thus, summary judgment on that question is **DENIED**.

**SO ORDERED.**

June 25, 2024

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE